671 F.2d 221
 In the Matter of INNKEEPERS OF NEW CASTLE, INC., Debtor.
Appeal of Robert J. MALEY, Claimant-Appellant Cross-Appellee.
In the Matter of INNKEEPERS OF NEW CASTLE, INC., Debtor.
Appeal of ALEXANDER HAMILTON LIFE INSURANCE COMPANY OF
AMERICA, Cross- Appellant.
 Nos. 81-1037, 81-1109.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 12, 1981.
Decided Feb. 10, 1982.
 
 1
 Robert J. Maley, pro se.
 
 
 2
 Stephen W. Lee, Barnes, Hickman, Pantzer & Boyd, Indianapolis, Ind., for Alexander Hamilton Life Ins. Co.
 
 
 3
 Thomas J. Teague, Teague, Cole & Hamer, Anderson, Ind., for intervenor.
 
 
 4
 Before CUMMINGS, Chief Judge, FAIRCHILD, Senior Circuit Judge, and EAST, Senior District Judge.*
 
 
 5
 EAST, Senior District Judge.
 
 
 6
 Claimant-appellant Robert J. Maley (Maley) appeals an order of the District Court entered in the above bankruptcy matter on December 11, 1980, which awarded attorney fees to Maley and another attorney in the undivided amount of $325,000, plus expenses, for services rendered in the defense of an action by the State of Indiana (State) seeking to condemn land and highway access owned by Innkeepers of New Castle, Inc. (Innkeepers).
 
 
 7
 Maley had entered into a contingent fee contract for his legal services with Innkeepers, but shortly before the condemnation action came to trial in state court, Innkeepers filed a petition in the District Court seeking rearrangement of its financial affairs pursuant to Chapter 11 of the Bankruptcy Act of 1898, 11 U.S.C. §§ 1 et seq. (1976) (Bankruptcy Act).[1] Thereafter Maley and the other attorney, Jim Cordes, successfully pursued the state court defense and recovered a substantial award for Innkeepers. Both Maley and Cordes perfected liens on the judgment in accordance with Indiana law.
 
 
 8
 The District Court refused either to give effect to the contingent fee contract or to enforce the liens, and instead set the attorney fees awards on a "reasonable fee" basis in accordance with bankruptcy law. We reverse in part, affirm in part, and remand.
 
 BACKGROUND
 
 9
 The pertinent facts are undisputed and are best narrated in the following chronological order:
 
 
 10
 In July of 1966, Andrew and Lucille Tabor, husband and wife, were the owners of record of a 33.96 acre tract of land in Indiana which was bordered on the west for approximately 400 feet by State Road # 3 and on the south by a public road which intersected with State Road # 3. At that time, Andrew Tabor was the owner of the franchise for a Holiday Inn Motel which he contemplated constructing on a part of the 33.96 acre tract.
 
 
 11
 On July 8, 1966, Andrew Tabor, acting in the name of the Holiday Inn, applied to the Indiana State Highway Commission for a permit to construct a driveway entrance and exit onto State Road # 3 for the use of the then proposed motel. The Commission's Permit Engineer responded with a letter to Andrew Tabor dated November 29, 1966 which purported to deny the driveway application because of a proposed widening and limitation of access to State Road # 3 at that location. However, at that time no final plans had been formulated for any modification of State Road # 3.
 
 
 12
 On February 24, 1967, Innkeepers of New Castle, Inc. was incorporated under the laws of Indiana for the purpose of owning and operating a Holiday Inn Motel. The principal stockholders were the Tabors who owned seventy-eight percent of the outstanding stock. Andrew Tabor was the president-treasurer, and Lucille Tabor was the vice president.
 
 
 13
 The Highway Commission eventually formulated its plans to modify State Road # 3. On April 7, 1969, following fruitless negotiations, the State notified the Tabors by letter that it intended to condemn a narrow strip of land and all rights of access along the entire length of the western edge of the Tabors' tract bordering State Road # 3. The letter included an offer of $7,731 in compensation for the proposed condemnation. No separate offer of compensation was ever made to Innkeepers.
 
 
 14
 On May 31, 1969, the Tabors deeded to Innkeepers 4.82 acres out of their larger tract. Innkeepers' new tract had a frontage along the east side of State Road # 3 of approximately 350 feet. The part of the original tract retained by the Tabors assumed the form of a lazy-U, fronting State Road # 3 on the north and south legs of the U. The deed to Innkeepers was recorded on June 2, 1969. Financing for the Holiday Inn was obtained by Innkeepers, and construction was substantially completed by October of 1969.
 
 
 15
 On December 19, 1969, the State filed its condemnation action in the Circuit Court of Henry County. Although the State sought to condemn the entire 400 feet of frontage on State Road # 3, including the frontage within the tract previously deeded to Innkeepers, and although the condemnation action was intended to have the effect of depriving Innkeepers' Holiday Inn Motel of access to the road, Innkeepers was not named as a party to the action.
 
 
 16
 The Tabors retained Maley to represent them and orally agreed to a contingent fee contract at a rate of fifty percent of any net gain received above the State's original offer. This contract, however, was not reduced to writing until May 5, 1971.
 
 
 17
 Maley filed an appearance on behalf of the Tabors in January of 1970. In August of 1970, Innkeepers opened the Holiday Inn Motel for business under the management of the Tabors. The condemnation action proceeded to the appointment of appraisers by the court. Maley filed exceptions to the appraisers' report, requested a jury trial, and began extensive preparations for trial.
 
 
 18
 In April of 1971, Andrew Tabor, acting as president of Innkeepers, agreed that Maley would also represent Innkeepers in the condemnation action. This contingent fee contract between Innkeepers and Maley (Maley's fee contract) contained the same terms and conditions as the Tabor-Maley contract, except that no base amount would be deducted from any recovery since the State had made no prior offer to Innkeepers as an entity separate from the Tabors. Maley's fee contract, however, was not reduced to writing until January 5, 1976, and then by an addendum to the earlier dated Tabor-Maley contract.
 
 
 19
 On September 13, 1971, the court entered an ex parte order granting the State's motion to amend its complaint to join Innkeepers as a party defendant. Maley filed objections to the order on the grounds that it bypassed the statutory requirement that the State give the property owner ten days' written notice of the proposed condemnation along with an offer of compensation. After briefing and a hearing, Maley's objections were overruled.
 
 
 20
 Maley then obtained a change of venue to the Circuit Court in another county, and the cause was set for jury trial beginning January 5, 1976. However, before trial Maley successfully secured separate trials for the condemnation action against Innkeepers' tract and the action against the tract retained by the Tabors individually.
 
 
 21
 On January 16, 1976, the condemnation cause against the Tabors individually resulted in a judgment of just compensation and interest since the date of taking in the amount of $31,217.36. Maley was compensated for his services on behalf of the Tabors in accordance with the Tabor-Maley contingent fee contract.
 
 
 22
 During the pretrial proceedings in the action against Innkeepers, the State expounded its theory that Innkeepers was not damaged by the loss of access to State Road # 3 because access could be obtained by easement across the Tabors' land to the public road lying to the south. The legal issues involved included whether Innkeepers was entitled to an easement by necessity because its parcel was landlocked, whether Innkeepers was equitably estopped from asserting that its tract was landlocked since it knew of the proposed condemnation of access when it obtained the property and built the motel, and whether the State could pierce the corporate veil to show that Innkeepers was the alter ego of the Tabors.
 
 
 23
 Maley prevailed on these issues by obtaining, through a motion in limine, a bar to the State making any reference to the relationship between the Tabors and Innkeepers during the trial. The condemnation action against Innkeepers was set for jury trial on December 6, 1976. Just twenty-six days before trial, however, the cross-appellant here, Alexander Hamilton Life Insurance Company of America (Hamilton), filed a suit against Innkeepers to foreclose the construction financing mortgage on the Holiday Inn tract.
 
 
 24
 On November 17, 1976, Innkeepers responded by filing a petition in the District Court seeking rearrangement of its financial affairs pursuant to Chapter 11 of the Bankruptcy Act. The Bankruptcy Court permitted Innkeepers to retain possession of its assets and to operate the motel under court supervision. On that same date, the Bankruptcy Court authorized Innkeepers, as debtor in possession, to employ both Maley and a separate law firm on general retainer to provide representation in the bankruptcy proceedings.
 
 
 25
 On the day of trial, Innkeepers as debtor applied for and received authority to proceed with its litigation in the condemnation action.[2]
 
 
 26
 On December 9, 1976, the two-day trial of the condemnation cause resulted in a jury award of $800,000 for the taking of Innkeepers' property and access to the highway. The state court entered a just compensation judgment for that amount, together with the amount of $335,254.79 accrued interest since the date of taking, for a total of $1,135,254.79.
 
 
 27
 Jim C. Cordes, an attorney at law, aided Maley as local counsel in the trial of the condemnation cause against the Tabors individually and has been compensated for his services in that trial. Cordes again performed local counsel services in the trial of the condemnation cause against Innkeepers at the request of Andrew Tabor, as president of Innkeepers. Maley and Cordes each entered their respective attorney's lien charges on the face of the judgment when it was entered.
 
 
 28
 On March 28, 1977, pursuant to an agreed entry, the Bankruptcy Court sequestered the proceeds of the just compensation judgment in favor of Innkeepers, ordering the proceeds of that judgment to be paid into the Bankruptcy Court and the priorities of the two mortgages be preserved. The order, however, ignored the perfected attorneys' lien charges.
 
 
 29
 Then followed some two and one-half years on appeal. The State appealed to the Indiana Court of Appeals resulting in a reversal of the just compensation judgment. Innkeepers appealed to the Indiana Supreme Court resulting on July 29, 1979 in the vacation of the decision of the Court of Appeals and the reinstatement of the state court's judgment of just compensation.
 
 
 30
 The clerk of the state court issued a check in the amount of $1,193,819.17 as partial payment of the just compensation judgment, payable to Maley, Cordes, and Innkeepers. On November 7, 1979, the Bankruptcy Court ordered that the check be endorsed by Maley and Cordes and delivered to Innkeepers, debtor in possession, to be deposited in a special account and then reinvested in certificates of deposit. That order specifically provided:
 
 
 31
 6. The asserted attorney liens of Robert J. Maley, Esq. and Jim C. Cordes, Esq., as aforesaid, attach to said proceeds to the same extent as if those said funds remained in the possession of the Clerk of the Circuit Court of Fayette County, Indiana.
 
 
 32
 (Emphasis supplied).
 
 
 33
 Thereafter Maley and Cordes each applied to the District Court for allowance of their respective attorney's liens.
 
 
 34
 Maley claimed a fee in an amount equal to fifty percent of the condemnation judgment plus the post-judgment accrued interest to date less the sum of $2,131, the mutually agreed upon amount of the State's offer to the Tabors allocable to the Innkeepers' tract, and arrived at a total claim of $668,734.83. Maley also claimed $5,505.62 for expenses and $8,875 for expert witness fees.
 
 
 35
 Cordes, who had no explicit fee agreement with Innkeepers, applied for a fee of $100,000 based upon the amount of time spent on the case, the services performed, the customary compensation for local counsel, and the amount of the recovery.
 
 
 36
 The District Court referred the determination of the fee claims to the Bankruptcy Court which held a full evidentiary hearing after notice to all parties. On July 29, 1980, the Bankruptcy Court returned its formal recommendations (Recommendations) to the District Court, recommending a repudiation of Maley's fee contract and an undivided award of attorney fees to Maley and Cordes of $325,000, less than one-half of the amount called for under Maley's fee contract. The Recommendations characterized the suggested fee award as a bankruptcy administrative expense, and directed that Maley and Cordes reach an agreement as to how to divide it. In addition, the Recommendations approved Maley's claims for expenses and expert witness fees.
 
 
 37
 Maley and Cordes filed objections to the Recommendations and requested an oral hearing.
 
 
 38
 On December 11, 1980, the District Court accepted and approved the Recommendations, without granting oral argument or any hearing, and ordered payment of the attorney fees and expenses of litigation allowances as recommended.
 
 
 39
 Maley filed a timely notice of appeal from that final order. Hamilton timely cross-appealed. Cordes did not appeal, and Innkeepers did not cross-appeal.
 
 ISSUES
 
 40
 1. Whether Maley's fee contract is valid under Indiana law.
 
 
 41
 2. Whether Maley has a valid statutory lien on the judgment.
 
 
 42
 3. Whether either the filing of bankruptcy proceedings or the Bankruptcy Court's order authorizing Innkeepers to proceed with the state court litigation invalidated Maley's fee contract and lien.
 
 DISCUSSION
 VALIDITY OF MALEY'S FEE CONTRACT
 
 43
 It is conceded by all parties and recognized by the Recommendations that Maley's fee contract with Innkeepers is in writing, dated some eleven months prior to the institution of the Chapter 11 proceedings, and calls for a fee payment in an amount certain, viz., fifty percent of the net recovery. No one disputes that at the time the Chapter 11 proceedings were instituted, Maley's contract was executory in nature in that it was to be performed in the future. See Re Jolly, 4 B.C.D. 202, CCH Bankruptcy Law Reporter 66,793. Maley was obligated to provide competent legal services in the defense of the State's condemnation action against Innkeepers through the final disposition of that case. Upon the completion of such services, the contract called upon Innkeepers to yield and pay the agreed fee.
 
 
 44
 There is no such thing as a tacit rejection of an executory contract under Chapter 11. Rejection must either be by affirmative action pursuant to § 313 or as part of a plan of arrangement under § 357(2). Federal's Inc. v. Edmonton Investment Co., 555 F.2d 577 (6th Cir. 1977), teaches:
 
 
 45
 "The failure to assume affirmatively an executory contract does not result at any time in the rejection of the contract. Whether the debtor is in possession, or whether there is a receiver or trustee, the contract can be rejected only by affirmative action under § 313(1) and Chapter XI Rule 11-53 or § 357(2). Unless so rejected, the contract continues in effect."
 
 8 Collier on Bankruptcy P 3.15(6)
 
 46
 (14th ed. 1976), quoted in Federal's Inc. v. Edmonton Investment Co., 555 F.2d at 579.
 
 
 47
 As far as the record discloses, no creditor ever sought a rejection of Maley's executory fee contract. Neither Innkeepers as debtor in possession (standing in the legal shoes of a trustee in bankruptcy) nor the Bankruptcy Court, sua sponte, ever specifically rejected the executory fee contract.
 
 
 48
 Finally, the order of December 6, 1976 authorizing Innkeepers to proceed with the condemnation proceedings as debtor, its original status as a signatory to Maley's fee contract, did not specifically reject the executory fee contract.
 
 
 49
 It is significant to note at this juncture that neither any creditor nor the debtor in possession nor the Bankruptcy Court, sua sponte, sought the substitution of the debtor in possession for Innkeepers as a party defendant.
 
 
 50
 No one wished to subject the assets of the estate, then in the hands of Innkeepers as debtor in possession, to further administrative costs or attorney fees which might be incurred in conducting the litigation. The reason for this state of affairs, as noted in the Recommendations, was that "the chances for a substantial recovery (were) not great." No cash advances nor other bases of further indebtedness on the part of the estate's assets were requested or authorized. We infer that all parties were willing to maintain the status quo of the litigation and that only Maley had sufficient faith that a recovery would be obtained to carry the burden of the litigation to its successful conclusion.
 
 
 51
 Maley's fee contract was not rejected until December 11, 1980, when the District Court adopted the Recommendations repudiating Maley's contract. However, the purported rejection came too late as Maley had long since fully performed his obligations under the contract with acknowledged legal expertise.[3]
 
 
 52
 The state court granting the just compensation judgment in favor of Innkeepers originally held the obligation and prerogative of determining the validity of the fee contract and the extent of the corresponding lien under Indiana law. The subsequent appeals stayed the exercise of that obligation. The Bankruptcy Court's order of November 28, 1977, sequestering the proceeds of the condemnation judgment, while proper, ultimately deprived the state court of the opportunity to fulfill that obligation. Thus the Bankruptcy Court assumed the duty to determine the validity of Maley's fee contract under Indiana law.
 
 
 53
 We agree with the findings in the Recommendations that Innkeepers was "unable and unwilling to compensate Maley on an hourly basis ... (and) this contract is a normal type of arrangement for fees in condemnation proceedings, expecially (sic) when the chances for a substantial recovery are not great.... (T)he ... fee agreement was a fair one under the circumstances based upon the standards provided by Indiana law."
 
 
 54
 We hold that the fee contract between Innkeepers and Maley was a valid subsisting executory contract throughout the entire state condemnation action against Innkeepers, and Maley fully performed his part of the contract. The procedures of § 313(1) or § 357(2) of Chapter 11 were never utilized to affirmatively reject the contract and, as discussed below, the Bankruptcy Court's authorization for Innkeepers to proceed with the litigation as debtor did not constitute a rejection of the contract.
 
 VALIDITY OF MALEY'S LIEN
 
 55
 Attorney's liens in Indiana are governed by I.C. 1971, 33-1-3-1 which provides in relevant part:
 
 
 56
 Any attorney practicing his profession in any court of record in this state, shall be entitled to hold a lien, for his fees, on any judgment rendered in favor of any person or persons employing such attorney to obtain the same: Provided, That such attorney, within sixty (60) days from the time such judgment shall have been rendered, enter in writing upon the docket or record wherein the judgment is recorded, his intention to hold a lien thereon, together with the amount of his claim ....
 
 
 57
 In Booram v. Day, 216 Ind. 503, 25 N.E.2d 329, 330 (1940), the Supreme Court of Indiana observed:
 
 
 58
 (S)tatutes of this character are generally held to authorize a lien upon something ... recovered for ... the client ... and to be prompted by the same policy that entitles a mechanic to be reimbursed out of that which he creates or improves....
 
 
 59
 Maley satisfied the requirements of this statute by timely recording on the face of the judgment his intention to hold a lien in the amount called for by his valid contingent fee contract.
 
 
 60
 EFFECT OF THE BANKRUPTCY PROCEEDINGS ON MALEY'S FEE CONTRACT AND LIEN
 
 
 61
 The Recommendations concluded that due to the filing of the bankruptcy proceedings and the Bankruptcy Court's subsequent authorization of Innkeepers to proceed with the condemnation litigation, the provisions of Bankruptcy Rules 219[4] and 220[5] displaced Maley's fee contract and lien as the basis for determining the amount of the attorney fee award. We disagree.
 
 
 62
 Innkeepers, upon its appointment as debtor in possession, held the duty to garner unto the summary jurisdiction of the Bankruptcy Court all of the assets of the debtor Innkeepers and to report them to that court. Among the assets of Innkeepers, the debtor, was a chose in action of constitutional origin to receive just compensation for its properties being taken by the State for a public use in the condemnation action. This chose in action was, however, encumbered with Maley's fee contract and the evolving Indiana statutory attorney's lien charges. Innkeepers fulfilled its duty by describing the chose in action and Maley's fee contract in its statement of affairs filed pursuant to § 324(1) of the Act, 11 U.S.C. § 724(1).
 
 
 63
 In an analogous situation, the court in Sherman v. Buckley, 119 F.2d 280 (2d Cir. 1941), noted that the Trustee (or, as here, the debtor in possession) was at liberty to exercise one of three options:
 
 
 64
 (1) It could have discontinued the litigation and disposed of the debtor's chose in action as best it could. Yet here, Attorney Maley's valid executory fee contract would have to have been affirmatively rejected and liquidated.
 
 
 65
 (2) It could have intervened in the state condemnation action or substituted itself in lieu of the corporate Innkeepers as a necessary party defendant and taken on the furtherance of the litigation. In that event, the debtor in possession could have retained Maley as the attorney under his fee contract or under some other mutually agreeable terms of employment, or discharged Maley and employed another attorney. However, had Maley been discharged as the attorney, his valid fee contract would have to have been liquidated.
 
 
 66
 (3) It could have left the litigation in its status quo by leaving Innkeepers as debtor and Attorney Maley to fight out the litigation at their own expense, and then stepped in to claim the fruits of the recovery encumbered with Maley's attorney fee lien charge.
 
 
 67
 The third option is exactly what the debtor in possession and the Bankruptcy Court elected to do, as evidenced by the December 6, 1976 order authorizing Innkeepers as debtor to carry on. That order subjected the whole of the litigation, including the settlement and liquidation of the attorney's lien charge based on Maley's fee contract, to the jurisdiction of the state court.
 
 
 68
 In spite of the fact that the jurisdiction of the bankruptcy court is usually described as "exclusive," it may consent to have the interests of third persons in property of which the bankrupt had possession, adjudicated in a state court if that is more convenient. (Citations). As we have said, the (debtor in possession) got the permission of the bankruptcy court to allow the action to be prosecuted in the state court. That necessarily involved a consent to such incidents as the exercise of that court's jurisdiction might involve ....
 
 
 69
 Sherman v. Buckley, 119 F.2d at 282.
 
 
 70
 We proceed upon the simple premise that throughout the state court condemnation action against Innkeepers, Maley was performing legal services for his client Innkeepers in its pre-Chapter 11 status and thereafter in its status as the debtor, subject to the jurisdiction of the state court, with the express approval and consent of the Chapter 11 Bankruptcy Court. Maley never performed any legal services for Innkeepers as debtor in possession under the direction of the Bankruptcy Court, and his fee claims do not relate to any such services.
 
 
 71
 At the time of the December 6, 1976 order granting Innkeepers as debtor authority to continue the litigation in the State's condemnation action, the Bankruptcy Court well knew from Innkeepers' Statement of Affairs then before it that Maley held the fee contract with Innkeepers for his legal services calling for a fee of fifty percent of the net recovery.
 
 
 72
 We specially note that at the commencement of the Chapter 11 proceedings, some twenty-six days before the trial date of the condemnation action, Maley had for all practical purposes completed his legal services by obtaining a favorable pretrial stance and developing a trial strategy and proposed trial expert evidence of damages for the loss of access. All that was left to be done was to put that legal work product to play during a short two day trial. The appeals were forced upon Maley and he served with remarkable expertise for no additional fee.
 
 
 73
 Throughout the Recommendations, the legal services of Maley and Cordes were considered as services for Innkeepers as debtor in possession rather than for Innkeepers in its pre-Chapter 11 status and thereafter in the status as debtor. The Recommendations then proceeded to repudiate Maley's valid fee contract provisions, and in lieu thereof, utilized bankruptcy law in fixing Maley's and Cordes' fees in a lower undivided amount of $325,000. The award was expressly based upon a consideration of the factors enumerated in Jacobowitz v. Double Seven Corp., 378 F.2d 405, 408 (9th Cir. 1967).
 
 
 74
 In Jacobowitz, the trustee's attorney, under appointment by the Bankruptcy Court, expended many hours during plenary proceedings in bankruptcy in performing legal services for the estate. The attorney held no fee contract calling for an amount certain. He filed a claim in quantum meruit claiming that the measure of compensation should be the amount he would have received for the same services in private practice. Jacobowitz rejected the contention that such a measure of compensation is conclusive and instead adopted a bankruptcy law test of balancing the factors involved in any given case. Those factors include the size of the estate and the proportionate amount thereof recovered through the efforts of the attorney, the time expended by the attorney, the difficulty of the legal issues involved, the attorney's skill, the opposition met, and the expert evidence concerning the reasonableness of the requested fee. All of these factors are to be considered in light of the "economical spirit of the Bankruptcy Act." Id.
 
 
 75
 The utilization of these factors here, however, was reversible error because Maley's services were not rendered as part of the bankruptcy proceedings, but were instead performed on behalf of the debtor pursuant to a valid fee contract which antedated the filing of the bankruptcy petition and which was never rejected.[6]
 
 
 76
 This court's decision in In re Land Investors, 544 F.2d 925 (7th Cir. 1976), does not compel a different conclusion. That case upheld a Bankruptcy Court's utilization of a "reasonable fee" basis in determining the extent of attorney's liens against the proceeds of a state court lawsuit which had been commenced before the plaintiff filed for bankruptcy. The attorneys there had entered into a contingent fee contract with the plaintiff which, unlike Maley's contract, specified no particular fee or percentage of the recovery which was to be awarded to the attorneys. Instead, the contract provided merely that the fee would be based on the amount and difficulty of the services provided and the degree of success achieved. After a favorable judgment was obtained in the state court action, the Bankruptcy Court ordered the proceeds turned over to the court.
 
 
 77
 This court upheld both the exercise of summary jurisdiction over the proceeds and the use of the "reasonable fee" standard in determining the extent of the liens. While the intervention of bankruptcy proceedings was held not to vitiate the lien, the Bankruptcy Court was found to have had "no real alternative to determining a reasonable contingent fee" due to the failure of the fee contract to specify a particular amount or percentage. Id. at 932.
 
 
 78
 In this case, however, Maley's fee contract specifically stated that his fee was to be fifty percent of any net recovery. It was, therefore, error to use a "reasonable fee" standard in lieu of the valid fee contract as the basis for determining the extent of Maley's lien.
 
 
 79
 The District Court's specific reliance upon Massachusetts Life Ins. Co. v. Brock, 405 F.2d 429 (5th Cir. 1968), cert. denied, 395 U.S. 906, 89 S.Ct. 1748, 23 L.Ed.2d 220 (1969), in approving the Recommendations is similarly misplaced. That case involved an appeal by a creditor in a Chapter 10 proceeding from the District Court's allowance of interim fees for the trustee and his attorney who held no contract for fees. The application of bankruptcy law in determining reasonable fees for the services of the trustee and his attorney was entirely correct in that cause because their services, unlike Maley's, were rendered only after the Chapter 10 proceedings had begun, only in connection with those proceedings, and only under the jurisdiction of the Bankruptcy Court.
 
 
 80
 The Bankruptcy Court here, by contrast, through its December 6, 1976 order, first relinquished its "exclusive summary jurisdiction" over Innkeepers' just compensation litigation to the state court. That necessarily included all legal incidents flowing from that state jurisdiction, including the settlement and liquidation of any perfected Indiana attorney's lien from the proceeds of a judgment entered by that court. See Sherman v. Buckley, 119 F.2d at 282.
 
 
 81
 The subsequent March 28, 1977 order sequestering the proceeds of that judgment was the first exercise of the Bankruptcy Court's exclusive summary jurisdiction of the proceeds of the chose in action. However, that exercise did not defeat the priority of Maley's perfected attorney fee lien.
 
 
 82
 Bankruptcy courts are subject to some limitations in the exercise of their summary jurisdiction in circumstances such as those presented here. Thus, "(w)here an attorney (is retained to seek a recovery in pending litigation) on behalf of a (client who becomes a bankrupt midstream), the filing of a petition in bankruptcy does not terminate his employment nor stay the pending (litigation)." In re Prudence Co., 96 F.2d 157, 159 (2d Cir. 1938). Where the trustee or debtor in possession elects not to take over the litigation, thereby avoiding subjecting the estate to any risk of loss, the pre-bankruptcy attorney fee contract remains in effect. Id.
 
 
 83
 Thus, when the Bankruptcy Court sequestered the proceeds of the recovery on Innkeepers' chose in action, those proceeds were encumbered with the perfected attorney's lien charges for Maley's services pursuant to his fully executed fee contract. "Bankruptcy does not invalidate such liens." In re Prudence Co., 96 F.2d at 160.
 
 
 84
 The Bankruptcy Court's order of November 7, 1979, taking over the proceeds of the Clerk's check for partial payment of the judgment, was the second attempt to exercise summary jurisdiction and foreclose the state court from acting in settlement and liquidation of Maley's perfected attorney's lien. The Bankruptcy Court, by so doing, stepped into the shoes of the state court for that purpose,[7] and acknowledged that fact in the above quoted paragraph 6 of the order.POST-JUDGMENT INTEREST
 
 
 85
 The Recommendations contained the erroneous conclusion that no part of the post-judgment interest accruing on the just compensation award should be awarded to Maley. Maley's fee contract provided for a fee of fifty percent of the net recovery and stated that the fee was to become due and payable when the amount of the judgment became payable to Innkeepers. The judgment became payable to Innkeepers when the just compensation judgment was entered. Therefore, interest accruing during the ensuing appeals is to be shared between the debtor in possession and Maley in proportion to their respective interests in the judgment.
 
 
 86
 The Recommendations also contain a clearly erroneous finding that Maley has been paid $2,500 of his fees. The undisputed evidence is that the notation in Innkeepers' Statement of Affairs indicating such a payment was a mistake.
 
 
 87
 The Recommendations correctly awarded Maley his personally paid expenses in the amount of $5,505.62 and the unpaid expert witness fees in the amount of $8,875.
 
 DISPOSITION
 
 88
 That part of the District Court's final order fixing Maley's fee in the amount of $325,000, to be shared with Attorney Cordes as they shall agree, is reversed.
 
 
 89
 That part of the District Court's final order granting Maley the recovery of his personally paid expenses in the amount of $5,505.62, as well as the amount of $8,875 for unpaid expert witness fees, is affirmed.
 
 
 90
 The cause is remanded to the District Court to hold an evidentiary hearing, after notice, for the purpose of determining:
 
 
 91
 (1) The total sum of the gross recovery for Innkeepers in the condemnation action under the final just compensation judgment plus all amounts of cost and expenses of litigation allowed by the Indiana courts following the appeals.
 
 
 92
 (2) The proper segregated amount of the State's ten-day letter final offer to be applied to Innkeepers' tract. From the sum of such gross recovery, the District Court shall:
 
 
 93
 (a) Distribute to the bankrupt's estate the amount of such segregated amount of the State's final offer;
 
 
 94
 (b) Distribute to Maley the sum of his allowed personally paid expenses and unpaid expert witness fees; and
 
 
 95
 (c) Designate the balance of the gross recovery as the net recovery for Innkeepers.
 
 
 96
 (3) The proper amount in settlement and discharge of Maley's perfected attorney's lien pursuant to the terms of his valid fee contract under Indiana law, and shall distribute that amount to Maley from the net recovery.
 
 
 97
 (4) The proper amount in settlement and discharge of Cordes' perfected attorney's lien on the basis of quantum meruit under Indiana law, and shall distribute that amount to Cordes from the net recovery.
 
 
 98
 (5) The balance of the net recovery for distribution to the bankrupt's estate.
 
 
 99
 (6) The total sum of the amounts of all post-judgment interest paid by the State and all of the interest received by the Bankruptcy Court from the investments of the proceeds of the final just compensation judgment, and shall distribute that total sum of interest, first, to Maley; second, to Cordes; and, third, to the bankrupt's estate, in the proportion that their respective award relates to the total recovery from the State for Innkeepers in percentages.
 
 
 100
 All not inconsistent with the foregoing opinion.
 
 
 101
 The District Court may, if deemed appropriate, refer the hearing and determinations to a Bankruptcy Judge for recommendations.
 
 
 102
 Maley is to recover allowable costs and expenses of appeal.
 
 CROSS-APPEAL
 
 103
 The subject of Hamilton's cross-appeal is now moot. The cross-appeal is dismissed with allowable costs and expenses on appeal to Maley.
 
 
 104
 REVERSED IN PART, AFFIRMED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS. CROSS-APPEAL DISMISSED.
 
 
 105
 FAIRCHILD, Senior Circuit Judge, concurring.
 
 
 106
 In my opinion, a court has some degree of supervisory power over attorney's fees charged for services in a case before the court. The power is derived from the relationship between the court and its officers, and it would include a decision that a literal application of a contingent fee contract would produce a fee so excessive that it could not be countenanced by the court as a matter of public policy. See, e.g., Snow v. Mikenas, 373 Mass. 809, 370 N.E.2d 1001, 1003 (1977) ("(A) judge is authorized to raise the question of the reasonableness of a contingent fee arrangement on his own motion where ... the attorney intends to collect his fee from funds to be distributed through him by court order"); Tonn v. Reuter, 6 Wis.2d 498, 504, 95 N.W.2d 261 (1959) ("A contingent-fee contract is always subject to the supervision of the courts as to its reasonableness"); Harmon v. Pugh, 38 N.C.App. 438, 248 S.E.2d 421, 425 (1978) ("(A contingent fee) contract, even though found to have been entered into fairly and in good faith and without suppression of fact, is subject ... to the scrutiny of the court as to its reasonableness"); see generally 7 Am.Jur.2d Attorneys at Law § 255 (1980); Annot. 77 A.L.R.2d 411.
 
 
 107
 I do not view the question of supervisory power as necessarily presented by this case. That approach would require a decision whether in these circumstances the state court or the bankruptcy court should exercise the power. The federal court decision that the amount it allowed is reasonable does not amount to a decision that the fee claimed per contract would be excessive, giving appropriate consideration to the factors incidental to contingent fee arrangements. And counsel have not argued that approach. Because I do not read this case as necessarily presenting the question of supervisory power, I concur in the opinion authored by Judge East, and dealing with the issues which the appeal does present.
 
 
 
 *
 Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 All United States Code and Bankruptcy Rules citations are to the Bankruptcy Act of 1898, as amended, and the rules promulgated thereunder, all of which were in effect at the time the bankruptcy proceedings were commenced. See Act of Nov. 6, 1978, Pub.L.No. 95-598, § 402, 92 Stat. 2682 (reprinted as preface to 11 U.S.C. § 101 (1979))
 
 
 [2]
 The Bankruptcy Court, in its recommendations to the District Court concerning the attorney fees award, erroneously stated that Innkeepers applied for authority to proceed with the litigation as debtor in possession. Innkeepers' request, however, was designated "Debtor's Application for Authority to Go Forward with Litigation," and the court's order stated that "the Court being duly advised in the premises now authorizes the debtor to proceed with the litigation." (Emphasis added). See page 228 infra
 
 
 [3]
 Maley's qualifications and skill in handling the case were described in the Recommendations:
 Applicant Maley was well qualified to handle all of the legal matters that arose during the entire condemnation proceeding. At the present time, he has been engaged in the practice of law some 24 years and, during that time, has specialized in litigation matters. Maley also testified that since he has begun practice, that he had handled more than one hundred eminent domain proceedings. Counsel with these skills was required in the condemnation proceeding because of the intricacy and novelty of the legal questions that arose during the condemnation proceedings at the trial court level and at the Indiana Court of Appeals and the Indiana Supreme Court. These skills were best evidenced by the result obtained by applicant Maley in securing a favorable decision at trial and on appeal.
 Much time and effort have been devoted by applicant Maley to this cause over a period of some ten years. When Maley was retained by the debtor to pursue the debtor's rights, the probabilities for the success ultimately gained were very slight. The legal questions and maneuvering encountered were successfully overcome and, as a result, not only was new law made in Indiana but the assets of the estate of the debtor were greatly increased.
 
 
 [4]
 Bankruptcy Rule 219 provides in part:
 (c) Factors in Allowing Compensation.
 (1) General. The compensation allowable by the court to a trustee, receiver, marshal, attorney, accountant, or other person entitled to compensation for services rendered in the administration of a bankrupt estate shall be reasonable, and in making allowances the court shall give due consideration to the nature, extent, and value of the services rendered as well as to the conservation of the estate and the interests of creditors.
 
 
 [5]
 Bankruptcy Rule 220 provides in relevant part:
 (b) Payment or Transfer to Attorney, or Agreement Therefor, After Bankruptcy. On motion by the bankrupt or on the court's own initiative, the court may examine any payment of money or any transfer of property, or any agreement therefor, by the bankrupt to an attorney after bankruptcy, whether the payment or transfer is made or is to be made directly or indirectly, if the payment, transfer, or agreement therefor is for services in any way related to the bankruptcy.
 (c) Invalidation of Unreasonable Payment, Transfer, or Obligation. Any payment, transfer, or obligation examined under subdivision (a) or (b) of this rule shall be held valid only to the extent of a reasonable amount as determined by the court. The amount of any excess found to have been paid or transferred under subdivision (a) or (b) may be recovered for the benefit of the estate or the bankrupt, as their interests may appear, and any obligation found to be excessive may be cancelled to the extent of the excess.
 
 
 [6]
 Even if the Jacobowitz test were applicable here, we note that the factor of considering the economical spirit of the Bankruptcy Act (keeping administrative expenses at a minimum), so heavily expounded in the Recommendations, was held in that case not to "require, nor justify, reducing a requested fee where, as here, by all other proper standards it is a fair and reasonable one ...." Jacobowitz v. Double Seven Corp., 378 F.2d 405, 408 (9th Cir. 1967)
 
 
 [7]
 See United States v. Transocean Air Lines, Inc., 356 F.2d 702 (5th Cir. 1966)